LAND, J.
 

 Defendant is charged with the murder of R. E. Davis in the parish of Jackson on the loth day of September, 1932. He was tried by jury, found guilty of manslaughter, and sentenced to the state penitentiary for a term of not less than eight nor
 
 more
 
 than twelve years, and to pay a fine of one dollar.
 

 On appeal, defendant relies upon 7 bills of exceptions:
 

 Bill No. 1.
 

 The district attorney, on direct examination, asked a state witness; Louis yarn-er, what statement or threats he had heard defendant make toward R. B. Davis, the deceased. The witness answered that defendant had said: “That was one man he was going to have
 
 to hurt.”
 
 Whereupon, the district attorney pleaded surprise, and requested the court to permit him to ask the witness leading questions in order to refresh his memory.
 

 Counsel for defendant objected for the reason that the witness had been a fair witness, and that anything the witness told counsel would be hearsay as to defendant, and not admissible.
 

 This objection was overruled by the trial judge, and the district attorney propounded to the witness the following questions:
 

 “Q, I will ask you if you didn’t tell me that about two weeks before the killing that you had started to the field to pick cotton when you met Mr. Avery and two of his boys? A. Yes, sir.
 

 “Q. His boys, Eloyd and Earl? A. Yes, six-.
 

 “Q. And you got to talking about the fire - business? A. Yes, sir.
 

 “Q. And that word was brought up about Mr. Davis, and Mr. Avery said that was one man he was going to have
 
 to
 
 hillf”
 

 Counsel for defendant again objected to the questions as leading, suggestive, hearsay, and inadmissible. These objections were overruled and the witness answered the district attorney, “Yes, six-.”
 

 As the defendant was charged with murder, the state had the right to prove prior threats by the defendant against the life of deceased, in order to show that the homicide
 
 *269
 
 was committed with malice aforethought, which is the essential ingredient of murder. This evidence was, in no sense, mere hearsay, but was clearly admissible as a link in-the proof of the state’s ease against accused.
 

 The state witness had changed his original statement made to the district attorney by substituting the word “hurt” for “kill,” and, as this was a material matter against the interest of the party introducing the witness and in favor of the other side, the district attorney was taken by surprise, and had the right to impeach the witness by asking him leading questions.
 

 State v. Soileau, 171 La. 801, 132 So. 351; Code of Crim. Proc. arts. 487 and 488.
 

 Besides, in our opinion, the witness was an unwilling or hostile witness, and leading questions were permissible, under article 373 of the Code of Criminal Procedure, which declares: “Art. 373. A leading question is one which suggests to the witness the answer he is to deliver, and though framed in the alternative, is inadmissible when propounded to one’s own witness, unless such witness bo unwilling or hostile.”
 

 At all events, defendant was not prejudiced by the testimony of this witness, as it appears from the per curiam to bill No. 1 that the state, without objection, offered the testimony of three or four witnesses to the fact that defendant, prior to the date of the killing, had made threats to them against the life of the deceased; that defendant himself testified, and did not deny that he made the threats testified to by these witnesses; and the record shows that the jury returned a verdict of manslaughter.
 

 Bill No. 2.
 

 Dr. Green, while acting as coroner, had examined the body of the deceased at the scene of the killing.
 

 On direct examination, he was asked the following question:
 

 “Q. Dr. Green, if there were two men of relatively equal strength engaged in any sort of affray, do you think it would have been possible for one of them to have inflicted the two wounds across the throat of the other in the manner in which you found the man in this case, unless the wounded man was prostrate, or substantially prostrate at the time?”
 

 This question was objected to by counsel for defendant for the following reasons: “Objected to as calling for the opinion of the witness as to a fact not requiring professional knowledge and on which the witness has not been qualified as an expert, and on a matter on which the jury is to determine and not the witness.”
 

 The objection was overruled by the court, and the witness answered: “No, I don’t think it is possible.”
 

 In the per curiam to this bill, the trial judge states: “The witness, Dr. L. Green, is a resident of Jonesboro in the Parish of Jackson, and before testifying, had been duly qualified as a practicing physician and a medical expert. In the absence of the Coroner on other professional duties, Dr. Green had been called upon by the Sheriff to go with him to the scene of the homicide in a distant part of the parish. When they arrived, according to the evidence, the body of the deceased was in the identical position in which it was when the first persons arrived after the death.
 
 *271
 
 There were no eyewitnesses to the slaying, except the accused. Dr. Green, upon instructions from the Sheriff, purported (proceeded) to form a coroner’s jury who assisted in the examination of the body. When discovered by the persons who first arrived and when examined two or three hours later by Dr. Green, in the presence of the Sheriff and those whom he had called as jurors and other bystanders, the body of deceased lay upon the left side'and shoulder. The throat of the deceased had been cut from ear to ear by two distinct wounds, each of which severed the external carotid, internal carotid, external maxillary, occipital, external and internal jugular, anterior jugular and anterior facial arteries and veins, all on both sides, and also the vagus nerves, and the knife used in making these wounds made its mark on the spinal column. The blood had flown downward upon the ground, forming a pool immediately underneath the wound, about the size of a man’s hat. There was no appreciable amount, of blood on the clothing, except such as had soaked into the shoulder and sleeve from the dripping wound and the pool thus formed.
 

 “Having recited this state of facts,
 
 Dr, Green, before being ashed the question which is the subject of this bill, had testified, without objection, that from the physical facts, that is, the position of the body, the nature and location of the woumds and the flow of blood therefrom, the throat of deceased had been cut ivhile he was lying in the position here described. He also testified that deceased had on the top and towards the back of his head a scalp wound,
 
 apparently inflicted by a blunt instrument, such as a club, from which some blood had run down through the hair on the back of the head,
 
 and, in his opinion, that the blow was sufficient to have felled the deceased and rendered him, uncoivseious.
 
 A .club freshly broken in two had been found within a few feet of the body.
 
 Testimony had been introduced showing that defendant admitted the killing.
 
 There was very little blood on the clothing of the defendant, no more than might have been put there by a man wiping his hands on his clothing.
 

 “In the light of all of these facts, undisputed, no prejudice could result from allowing Dr. Green to state whether, in his opinion, a man of physical strength substantially equal with that of the deceased could have cut the throat of deceased twice, in the manner described, unless the deceased at the time •had been prostrate or substantially prostrate.
 

 “Later, the defendant, testifying in his own behalf, stated that he, the defendant, was prostrate on the ground, lying on his back, and that R. E. Davis, the deceased, was on top of defendant, in a more or less prostrate position, when defendant inflicted the two wounds above described, which resulted in the death of the deceased; that, having inflicted said wounds, he,, defendant, turned the body of deceased from off defendant and laid it in the position in which it was later found by Dr. Green, the Sheriff and others.”
 

 The above per curiam shows that Dr. Green is an expert physician, who had made a personal examination of the wounds of the deceased.
 

 As stated in State v. Voorhies, 115 La. 203, 38 So. 964, 965: “It is well settled that physicians and surgeons may give their opinions as to the cause of death, the manner
 
 *273
 
 in which a- mortal wound was probably inflicted, the degree of force employed, the direction of the blow, etc., such opinion being based upon knowledge derived from professional attendance on the deceased, or from examination or from hypothetical statements. 12 Am. & Eng. Enc. Law p. 444; Underhill on Criminal Evidence, p. 372.”
 

 In the above ease it was also held that an expert physician or surgeon could be permitted to testify, from the nature of the wound, the distance of the party who held the gun from the deceased.
 

 In State v. Sharp, 145 La. 895, 83 So. 181, 182, it is said: “ ‘A nonexpert witness may describe the wounds which he saw on the body, and, a fortiori, a surgeon may give an opinion as to the probable cause of death, and may state, when, in his opinion, death occurred, and that it was not suicidal.’ Underhill on Cr. Ev. (Ed. 1898) 372; 12 A. & E. Enc. of Law, p. 144; 17 Cyc. 236; State v. Baptiste, 26 La. Ann. 135; State v. Voorhies, 115 La. 200, 38 So. 964.”
 

 In the Sharp Case, the state offered to prove by a regular practicing physician and surgeon, who had held the inquest, that “from the location of the wound and direction of the same and location of the shots in the mantel, it was impossible for the deceased to have killed himself, accidentally or intentionally, without the help of some mechanical contrivance, and that he had found none on the premises.”
 

 Defendant’s counsel objected that it was not properly expert testimony, and that the question was within the exclusive province of the jury. This objection was overruled by the trial judge, and the ruling was sustained by this court.
 

 In Bram v. U. S., 168 U. S. 532, 18 S. Ct. 183, 197, 42 L. Ed. 569, it is stated by Hr. Justice White as the organ of the court: “An objection to a question asked of a medical witness, whether, in his opinion, a man standing at the hip of a recumbent person, and striking blows on that person’s head and forehead with an axe, would necessarily be spattered with or covered with- some of the blood, was also properly overruled. We think the assumed facts recited in the question were warranted by the proof in the case, and that the evidence sought to be elicited from the witness was of a character justifying an expression of opinion by the witness,
 
 the jury, after all, being at liberty to give to the evidence such weight as in their judgment it was entitled, to."
 
 (Italics ours.)
 

 All of the facts, upon which Dr. Green based his opinion that the throat of the deceased had been cut while he was prostrate, went to the jury, who could give such weight to these facts, and to the opinion of the medical expert based thereon, as they might see fit.
 

 We find no error in the ruling of the trial judge.
 

 Bill No. 3.
 

 The district attorney offered in evidence two maps, containing certain written statements as to physical facts, without calling as witnesses the maker of the maps and the one who did the writing. This offering was objected to by defendant for the reason that the maps had not been identified as being correct by the testimony of the party or par
 
 *275
 
 ties who made them, and that they were, therefore, ex parte and hearsay.
 

 This objection was overruled, and properly so.. In the per curiam to this bill, the judge a quo states: “The person who made the two maps or plats in question was not called as a witness by the State. These maps showed the location of the roads and other physical facts in the immediate vicinity •of the scene of the killing and the location of the body of the deceased when found. At least three witnesses, including the Sheriff, who were specially familiar with that particular section and locality testified to the substantial correctness of the maps. Defendant’s counsel used and referred to these maps in his cross-examination of the State’s witnesses. The only writings appearing on the maps were such as were necessary to identify the objects indicated thereon.”
 

 Besides, the defendant took the witness ■stand in his own behalf, admitted the killing, and pleaded self-defense. We have already given in detail under bill No. 2 the testimony of Dr. Green, acting coroner, as to the finding of the body of déceased, its position, nature of wounds, etc.
 

 In our opinion, the maps admitted in evidence were sufficiently identified as correct by competent witnesses who testified in the case.
 

 Bill No. 4.
 

 Defendant attempted to prove by one Jim Bailey, .a defense witness, that Davis, the deceased, had made threats to the witness against Avery, the defendant, and that later the witness had communicated these .threats to defendant.
 

 The state objected
 
 to
 
 any testimony as
 
 to
 
 prior threats on the ground that no proper foundation had been laid for the introduction of such testimony.
 

 This objection was sustained by the court for the reason that, at the time Bailey was sworn as a defense witness, defendant had offered no testimony from his own, or the state’s, witnesses, tending to show, or that did show, an overt act or hostile demonstration upon the part of the deceased toward defendant at the time of the killing. This ruling was correct.
 

 On the cross-examination of this witness by the state, the following question was asked: “Q. Didn’t you tell Mr. Yancey Head at his house the next morning when you stopped, didn’t you get out and have a talk with Mr. Yancey Head, and didn’t you tell him you were looking for. this thing to happen, and that you had called Mr. Avery off a few nights ago down to the spring at the church and had tried to talk him out of it and that Mr. Avery promised you he wouldn’t do anything about it?”
 

 Counsel for defendant objected to this question, for the reason that “it is an attempt to impeach a witness on an immaterial matter-. It is hearsay and calls for the opinion of the witness and would be prejudicial to this defendant to enter into this conversation.”
 

 The objection was overruled, and the witness answered, "No.”
 

 Counsel for the state then asked this witness the following question: “Q. Didn’t you, on the morning after the killing, on the school bus in Miss Lola Head’s presence, and in the presence of others on the school bus, on
 
 *277
 
 the morning after the killing, Friday morning, say the same thing, that you were looking for this to happen and. that you had talked with Mr. Avery at the church house and tried to get him not to do anything about it, and he promised you he wouldn’t?”
 

 This question was objected to by counsel for the same reasons urged to the previous question. The objection was overruled, and the witness answered, “No, sir.”
 

 It appears from the per curiam to this bill that the state, without objection by defendant, proved by several witnesses that defendant, prior to the date of the killing, made threats against the life of R. E. Davis, deceased. For the purpose of rebutting this testimony, the defendant offered the testimony of several witnesses, who were acquaintances and friendly associates of defendant, one of whom was Jim Bailey, the witness sought to be impeached by the state. All of these witnesses testified that they had never heard defendant, during their constant association with him, make any threat or threats against the deceased.
 

 In view of the testimony offered by the state, that defendant had made threats against the deceased, and the testimony offered by defendant to negative such threats, or the making of such threats, by the witness Jim Bailey, it was proper for the state to impeach this witness.
 

 Bill No. 5.
 

 Counsel for defendant offered to prove, on direct examination, by a witness by the name of Rob Hinson, that deceased had made threats against defendant prior to the killing, and that the witness had communicated these threats to defendant.
 

 This offer to prove prior threats by defendant was objected to by the state, for the reason that no proper foundation had been laid, as no overt act on the part of deceased at the time of the killing had been proven.
 

 It is stated in the per curiam to this bill that, at the time this witness testified, the defendant, the only eyewitness to the homicide, had not testified, and no evidence had been offered by the defendant showing, or even tending to show, any overt act or hostile demonstration on the part of the deceased toward defendant at the time of the killing. -The ruling was correct.
 

 Bill No. 6.
 

 As stated in bill No. 4, the state had laid the foundation for the impeachment of the witness, Jim Bailey, by propounding to him certain questions as to certain contradictory statements made by him to Mr. J. T. Head. When Mr. Head was called by the state, and the impeaching question put to him, as substantially put to the witness Bailey, counsel for defendant objected to the question as hearsay, as calling for the opinion of the witness, and as an effort to impeach the witness on an irrelevant matter.
 

 The state had proven, without objection, throats made by defendant against the deceased, in order to show that the killing was done with malice aforethought, an essential element of the crime of murder, which the state was required to prove beyond a reasonable doubt.
 

 The defendant attempted to rebut the testimony of the state as to threats, by hav
 
 *279
 
 ing the witness Jim Bailey and others swear that they were his intimate associates and hoon companions, and had never heard him make any threats against deceased. The proof of malice aforethought in a prosecution (or murder is unquestionably a material matter, and testimony adduced by a defendant, rebutting testimony as to threats introduced by the state, cannot be said to be testimony as to an irrelevant matter. If the law were otherwise, a defendant could produce, with impunity, any number of false witnesses to contradict the testimony of the state witnesses as to threats made by a defendant against the life of a deceased.
 

 Nor was the impeaching question propounded to Bailey and repeated to Head hearsay ; nor did it call for the opinion of the witness, since the witness was asked only about the statements made by him and about his own conduct in connection with such statements.
 

 Bill No. 7.
 

 This bill was reserved to the overruling of a motion for a new trial, based upon the ground that the verdict was contrary to the law and the evidence, and upon the errors assigned in the various bills already disposed of in this opinion.
 

 This motion presents nothing for review as to the ground that the verdict was contrary to the law and the evidence. The trial judge found that the evidence adduced amply supported the verdict returned by the jury in this case.
 

 The verdict and sentence appealed from are affirmed.
 

 O’NIELL, C. J., dissents from the rulings on bills 3, 4, and 5.
 

 ST. PAUL, J., dissents on bill No. 3, as to the white map, which seems to show more-than only immovable objects.